Ed SEYMOUR; Shannon Seymour; and Ed and Shannon Seymour as guardians ad litem of Brayden Seymour, Plaintiffs–Appellants,

v.

BLUE CROSS/BLUE SHIELD, a Utah corporation, Defendant–Appellee.

No. 91–4111.

United States Court of Appeals, Tenth Circuit.

March 12, 1993.

Gerrit M. Steenblik of Jennings, Strouss & Salmon, Phoenix, AZ, for plaintiffs–appellants.

Timothy C. Houpt (Andrew H. Stone and D. James Morgan with him, on the brief) of Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT, for defendant–appellee.

Before McKAY, Chief Judge, and LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Appellants Ed and Shannon Seymour, for themselves and as Guardians Ad Litem for Brayden Seymour, brought suit seeking health insurance benefits from Appellee Blue Cross/Blue Shield of Utah (BCBSU) for Brayden's liver transplant. The district court proceedings were stayed pending an arbitration panel's consideration of the dispute. The panel found that BCBSU was not responsible for covering the liver transplant. The district court granted BCBSU's motion to confirm the arbitration panel award and denied the Seymours' motion to vacate it. The Seymours appeal the district court's order denying their claim to health insurance benefits for Brayden's liver transplant. We affirm.

## I.

Ed Seymour was a member of his employer's, Bookcraft, Inc. (Bookcraft), group

health insurance plan in July 1984. Mr. Seymour then married Shannon whom he added to his coverage. Effective December 1, 1984, Bookcraft and its employees switched medical coverage so that BCBSU became the carrier. The original policy offered by BCBSU covered liver transplants. An amendment to the policy was sent to Bookcraft and its employees in late December 1984, providing that coverage for liver transplants would be excluded beginning in February 1985. Bookcraft received the amendment, but the Seymours maintain they never received their copy. Neither the Seymours nor Bookcraft ever agreed *in writing* to the amendment, although a written agreement was then required under Utah law.[1] The original BCBSU policy, however, included a statement permitting BCBSU unilaterally to modify the policy as long as written notice was given thirty days before the modification took effect.[2]

Brayden Seymour was born in March 1987 with a congenital liver disease that was not diagnosed until he was ten weeks old. Mr. Seymour added Brayden as a dependent after his birth, and BCBSU mailed back to the Seymours a new insurance policy booklet which incorporated the 1985 amendment excluding coverage for liver transplants. When it was determined that Brayden required a liver transplant, Mr. Seymour applied to BCBSU and was denied coverage.[3]

The Seymours filed this action contending that BCBSU never properly amended the policy to exclude liver transplant coverage. Thereafter, the Seymours and BCBSU jointly moved to stay the district court proceedings pending the outcome of arbitration, which BCBSU asserted was re-

quired by the policy. The arbitration panel found that BCBSU was not legally obligated to pay for Brayden's transplant. The Seymours moved the district court to vacate the award, and BCBSU moved to confirm it. The district court, noting that federal court review of arbitration awards is very narrow and finding that the panel did not manifestly disregard the law, denied the Seymours' motion to vacate and granted BCBSU's motion to confirm the arbitrator's award. The Seymours contend on appeal that the arbitration award should not be enforced because BCBSU's unilateral modification of the original policy was contrary to Utah public policy.

## II.

■ So long as an arbitrator draws his decision from the parties' agreements, a reviewing court is generally precluded from disturbing the award. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 369, 98 L.Ed.2d 286 (1987) (citing *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). "[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be a better one." *W.R. Grace and Co. v. Local Union No. 759*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *see Enterprise Wheel*, 363 U.S. at 596, 80 S.Ct. at 1360. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct.

---

**1.** "No modification of any insurance contract shall be effective unless in writing executed by the insurer and if it contains conditions limiting or reducing benefits or protection otherwise applicable such writing shall also be executed by the insured." Utah Code Ann. § 31–19–26 (1953). This section, along with all of Title 31, was repealed in 1985 and replaced by Utah Code Ann. § 31A–21–106.

**2.** "The Plan shall at all times have the absolute right to modify or amend this Agreement from time to time; provided, however, that no such

modification or amendment shall be effective until thirty (30) days after written notice thereof has been given to the Subscriber or to the Subscriber's Group Leader [Bookcraft]." *Blue Cross/Blue Shield of Utah* Basic Health Care Agreement, 35.

**3.** BCBSU did pay for expenses relating to the diagnostic surgery and the surgery to correct Brayden's condition. It also covered Brayden's follow-up care for those surgeries, as well as follow-up care for the transplant itself.

at 371; *see also NCR Corp., E & M–Wichita v. District Lodge No. 70,* 906 F.2d 1499, 1503 (10th Cir.1990).

■ If a court is to disturb an award, it can only do so under strict statutory or judicially-created standards. The Federal Arbitration Act, 9 U.S.C. § 10 (1990), provides the statutory grounds upon which a court may vacate an arbitrator's award.[4] In addition, the Supreme Court has recognized a public policy exception that permits a court to decline to enforce an arbitrator's award. *See Misco,* 484 U.S. at 42, 108 S.Ct. at 373; *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183. It is this judicially-created ground for vacating an arbitration award upon which the Seymours rely.[5]

■ The public policy exception is rooted in the common law doctrine of a court's power to refuse to enforce a contract that violates public policy or law. It derives legitimacy from the public's interest in having its views represented in matters to which it is not a party but which could harm the public interest. *Misco,* 484 U.S. at 42, 108 S.Ct. at 373.[6] This judicially-created exception was explained in *Misco,* drawing upon *W.R. Grace:*

Two points follow from our decision in *W.R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced.

*Id.* at 43, 108 S.Ct. at 373 (citations omitted).

The circuit courts, as well as both parties here, disagree on whether a "broad" or "narrow" view of the public policy exception should be applied to assess arbitration

4. The statute provides:
   (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
   (1) Where the award was procured by corruption, fraud, or undue means.
   (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
   (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
   (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
   (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

5. Our decision in *Jenkins v. Prudential–Bache Sec., Inc.,* 847 F.2d 631 (10th Cir.1988), is not relevant here because it does not address the public policy exception.

6. The Court cited two early cases addressing the public interest in regard to contracts. *Misco,* 484 U.S. at 42, 108 S.Ct. at 373. One, *McMullen v. Hoffman,* 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117 (1899), discussed the nature of the public policy exception. "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract." *Id.* at 654–55, 19 S.Ct. at 845. The other, *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112 (1931), made clear that discovering what the public policy is requires a court to make an extensive survey. "In determining whether the contract here contravenes the public policy of [the state], the Constitution, laws, and judicial decisions of that state, and as well the applicable principles of the common law, are to be considered." *Id.* at 357, 51 S.Ct. at 477.

awards. *Compare, e.g., Stead Motors v. Automotive Machinists Lodge 1173,* 886 F.2d 1200 (9th Cir.1989) (en banc) (narrow view), *cert denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990), *with Stroehmann Bakeries v. Local No. 776, Int'l Bhd. of Teamsters,* 969 F.2d 1436 (3rd Cir.) (broad view), *cert. denied,* —— U.S. ——, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992); *Delta Air Lines v. Air Line Pilots Ass'n Int'l,* 861 F.2d 665 (11th Cir.1988) (same), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989). Significantly, however, the Court in *Misco* granted certiorari because of a prior split in the circuits, noting that "[t]he decision below accords with the broader view of the court's power taken by the First and Seventh Circuits. A narrower view has been taken by the Ninth and District of Columbia Circuits." *Misco,* 484 U.S. at 35 n. 7, 108 S.Ct. at 369 n. 7. The Court reversed the broader view that permitted a court to overturn an arbitrator's decision based only on a general view of supposed public interests without a review of the relevant laws and legal precedents to determine whether they established a " 'well-defined and dominant' policy against the [described conduct]." *Id.* at 44, 108 S.Ct. at 374.

■ Given the Supreme Court's clear guidance in *Misco* that we have quoted above, we believe it unhelpful to describe the public policy test as either broad or narrow as some of the courts are continuing to do. Rather, in determining whether an arbitration award violates public policy, a court must assess whether "the specific terms contained in [the contract] violate public policy," *id.* at 43, 108 S.Ct. at 373, by creating an "explicit conflict with other 'laws and legal precedents,' " *id.,* keeping in mind the admonition that an arbitration award is not to be lightly overturned, *see United Food & Commercial Workers, Local No. 7R v. Safeway Stores, Inc.,* 889 F.2d 940, 948 (10th Cir.1989); *Communication Workers v. Southeastern Elec. Coop.,* 882 F.2d 467, 468 (10th Cir.1989).

### III.

■ We turn now to the award in this case and the alleged violation of public

policy. The Seymours assert that the arbitrator's award violates Utah's clearly expressed public policy that an insurance policy may not be modified to reduce benefits unless the parties agree in writing. *See* Utah Code Ann. § 31-19-26 (*repealed* in 1985). BCBSU responds that the Utah insurance laws are preempted by ERISA. However, we recently held in *Winchester v. Prudential Life Ins. Co.,* 975 F.2d 1479, 1484-85 (10th Cir.1992), that while ERISA preempts state insurance laws as applied to self-funded ERISA plans, it does not preempt state insurance laws insofar as they regulate purchased insurance policies. Because the insurance contract in this case was purchased, it remains regulated by the Utah insurance statutes.

BCBSU alternatively points out that section 31-19-26 was replaced in 1985 by Utah Code Ann. § 31A-21-106, which provides:

(1) No insurance policy may contain any agreement or incorporate any provision not fully set forth in the policy or in an application or other document attached to and made a part of the policy at the time of its delivery....

(2) Except as provided in Subsection (3) or (4), or as otherwise mandated by law, no purported modification of a contract during the term of the policy affects the obligations of a party to the contract unless the modification is in writing and agreed to by the party against whose interest the modification operates.

(3) Subsection (2) does not prevent a change in coverage under group contracts resulting from provisions of an employer eligibility rule, the terms of a collective bargaining agreement, or provisions in Federal Employee Retirement Income Security Act plan documents.

While recognizing that subsection (2) of this statute requires the modification of an insurance contract during the term of the policy to be in writing and agreed to by the parties against whose interest the modification operates, BCBSU contends that subsection (3) of the statute exempts ERISA plans from this requirement. The Sey-

mours, on the other hand, assert that subsection (3) is intended to apply only to modifications that result from action taken by the employer and employees. Under their interpretation, therefore, the requirements of subsection (2) are eliminated only where the employer and the employees agree to modify a group contract, collective bargaining agreement, or ERISA plan. The Seymours claim that no such employer-employee action is involved here and therefore subsection (3) is not applicable.

We need not resolve the parties' dispute as to the applicability of section 31A–21–106(3) because even if the Seymours are correct that subsection (2) governs, we hold that they have not established a public policy violation sufficient to overturn the arbitrator's award. Under the public policy standard we have articulated above, the arbitrator's decision in favor of BCBSU does not violate a clearly expressed law. The arbitrators could have reasonably construed the facts of this case to meet the requirement of subsection (2) that a modification be "in writing and agreed to by the party against whose interest the modification operates." BCBSU reissued the Seymours' policy in March 1987, shortly after Brayden was born. The new policy contained the organ transplant exclusion. The Seymours acknowledge that they received the new policy, and both the Seymours and Bookcraft paid the insurance premiums without protest. An arbitrator could have reasonably concluded that acceptance and payment of premiums meets the "agreed to" requirement. We cannot say subsection (2) *clearly* provides that these facts would not constitute an agreement by the company and the Seymours to the modification. We therefore conclude there was no clear violation of Utah public policy.

WE AFFIRM the district court order confirming the arbitration award.