**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80257**
**(303) 844-3157**

Patrick J.  Fisher, Jr.                                                      Jane B. Howell
Clerk                                                              Chief Deputy Clerk

June 29, 2001


**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   00-7039, *Bowen v. Amoco Pipeline Co.*
Filed on June 20, 2001

The court's slip opinion filed on June 20, 2001, contained minor citation errors.  A copy of the corrected opinion is attached.

Sincerely,

Patrick Fisher, Clerk of Court


By:
Amy Frazier
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 20 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ERNEST BOWEN; MARY BOWEN,

Plaintiffs - Appellees,

v.

AMOCO PIPELINE COMPANY,

Defendant - Appellant.

No. 00-7039

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. 98-CV-243-S)**

Stephen Ward, Gardere, Wynne, Sewell, LLP, Tulsa, Oklahoma, and G. Steven Stidham, Sneed, Lang, P.C., Tulsa, Oklahoma (Brian S. Gaskill and Steven K. Balman, Sneed, Lang, P.C., Tulsa, Oklahoma, and Steven J. Adams, Gardere, Wynne, Sewell, LLP, Tulsa, Oklahoma, with them on the briefs), appearing for Appellant.

Michael L. Darrah, Durbin, Larimore & Bialick, Oklahoma City, Oklahoma (Bill M. Roberts and Katherine T. Loy, Durbin, Larimore & Bialick, Oklahoma City, Oklahoma, and Allan DeVore, The DeVore Law Firm, P.C., Oklahoma City, Oklahoma, with him on the brief), appearing for Appellee.

Before **TACHA**, Chief Judge, **GIBSON**,[*] and **LUCERO**, Circuit Judges.

---

[*]Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

**TACHA**, Chief Judge.

Defendant Amoco Pipeline Company appeals from the district court's confirmation of an arbitration award. We exercise jurisdiction pursuant to 29 U.S.C. § 1291 and affirm.

## I. Background

I.    Facts

In 1993, Ernest Bowen noticed an oily sheen in Flag Branch Creek, which is located on his property. After investigating the matter, the Oklahoma Corporate Commission (OCC) concluded remediation of the creek would be more detrimental than beneficial. In 1993, however, Mr. Bowen again observed a sheen in the creek, after which he notified the Pollution Control Division of the OCC, as well as Amoco Pipeline Company (Amoco) and Koch Gathering Systems, Inc. (Koch). Both Amoco and Koch own oil pipelines that cross the creek; Koch owns two idled lines and Amoco owns two idled lines and two active lines. After being notified by Mr. Bowen, Amoco retained Geosearch Environmental to determine the source of the sheen. Although Geosearch found hydrocarbon contamination near the creek, it concluded the source was an upstream historic release of oil, rather than a leak from Amoco's pipelines. Contrary to Amoco's

-2-

conclusions, research conducted by Mr. Bowen's expert, Fox Hollow Consultants, Inc., suggested that a leak in Amoco's lines may be the source of contamination. Under Fox Hollow's theory, oil had leaked from Amoco's lines, migrated downward to the water table about nine feet below, and then floated on the water table to the creek.

In a memorandum dated September 1996, the OCC summarized the information available regarding the contamination in Flag Branch Creek and reached some conclusions. In evaluating potential sources of the contamination, the OCC dismissed oil wells and old documented pipeline leaks. No oil well was close enough to the creek to be the source, and the two nearby documented leaks from Koch pipelines could not have contaminated Flag Branch Creek because they were contained within their immediate spill areas. Because wells and documented leaks were not the source, the OCC concluded the source of the hydrocarbon contamination must be an undocumented leak from one of the six pipelines. Through deductive reasoning, the OCC arrived at a theory similar to that proposed by Fox Hollow Consultants: oil from one of the lines leaked into the porous sandy alluvial deposits, migrated downward to the water table approximately nine to ten feet below the surface, and floated on the water table to the creek. In order to determine the source, the OCC recommended Koch and Amoco uncover their lines in order to expose any visual evidence of historic or

current leaks.

Despite Amoco's repeated assertions of its good corporate citizenship and willingness to follow all rules and regulations, it refused to follow the OCC's recommendation and uncover its pipelines, arguing uncovering the lines would be unnecessary and jeopardize the lines' safety. After performing some trenching around its lines and finding no hydrocarbons, Amoco continued to deny any responsibility for the contamination but emphasized that, were Amoco the responsible party, it would clean up the pollution. In April 1997, Koch concluded its investigation. The following month, the OCC sent Amoco a letter explaining that Koch's information indicated Amoco's pipeline on the east side of the creek may be the source of contamination. Despite this information, Amoco continued its refusal to strip the lines, offering instead to do some soil borings and recommending the Oklahoma Energy Resources Board (OERB) become involved.

Displeased with Amoco's continued denial of any responsibility, Mr. and Mrs. Bowen filed a lawsuit in May 1998 in federal district court, asserting a cause of action for damages to real property, nuisance, trespass, unjust enrichment, breach of contract, and exemplary damages. In July, Amoco asked the district court to stay the proceeding and order the dispute to arbitration pursuant to an

enforceable arbitration agreement.[1]  In arguing their motion to compel arbitration, Amoco contended the arbitration panel would have the power to decide *all* claims, an assertion they now refute.  The Bowens objected to arbitration, challenging the arbitration agreement as unenforceable.  In October 1998, the district court granted Amoco's motion and entered an order compelling arbitration.

In July 1998, Amoco responded to the Bowens' interrogatories, continuing to deny its lines were the source of hydrocarbon contamination in the creek.  In addition, Amoco explicitly denied that any leaks or spills attributable to its pipeline operation had occurred on the Bowens' property and even denied the existence of pollution in the soil.  The following month, Fred Hesser, a district environmental health and safety coordinator for Amoco, stated in his deposition that from 1995 to January 1998 he encountered no evidence indicating Amoco might be the source of the contamination.  In October, however, Amoco's tests confirmed the presence of hydrocarbons in the soil under its lines but found no contamination in the groundwater.

In June and July of 1999, three years after the OCC recommended that Amoco uncover its pipelines, Amoco exposed limited portions of its lines on the

---

[1] In 1918, the predecessors in interest of both parties entered into a right-of-way agreement, which contained an arbitration provision.  This agreement, which governed the grant of a pipeline easement, was ratified in 1943 by a second agreement.

Bowens' property and admitted the existence of contaminants next to the lines. Significantly, the stripping of the lines revealed a pipeline replacement in the contaminated area. Less than two months before the arbitration hearing, the Bowens discovered that Amoco had replaced approximately 1,000 feet of pipeline on the east side of the creek. According to the Bowens' expert, the 1,000 feet of replaced pipeline corresponds almost exactly with the contaminated creek area. Although Amoco had not explicitly disclosed the line replacement and had repeatedly denied any link to the contamination, it claimed to have provided the Bowens with a line sheet showing the replacement. Amoco did not, however, explain the information contained in the line sheet, which was technical and difficult to read, until the arbitration hearing when its employee testified that approximately 1,000 feet of pipeline was replaced in 1950.

Other than the line sheet, Amoco claimed it could find no other records detailing the reasons for and circumstances surrounding the 1950 line replacement–despite some testimony that it was corporate practice to keep such records.[2] Although Amoco's employees and experts argued the line replacement

_____

[2] In February 1996, in preparation for the OCC pollution abatement group, Fred Hesser circulated a memo requesting information on repairs made to the line in 1950. The OCC's memo, dated September 1996, however, contains no mention of a 1950 line replacement in summarizing the information Amoco had disclosed thus far. Based on the record, Amoco appears not to have disclosed this information in any subsequent communication with the OCC. Although the

(continued...)

could have been a preventative measure, they admitted a leak in the line would be one explanation for the line replacement and for the concentration of crude oil in the soil in that exact location. Moreover, after years of denying any connection to the contaminated soil, Dennis Beckman, Fred Hesser's replacement, finally testified that the hydrocarbon-contaminated soil under the replaced pipelines was probably from Amoco's line. Testing by Amoco's own expert confirmed the oil around the replaced line–as well as the oil in the creek–was at least twenty years old, further evidence that the more recent leaks from Koch's pipelines were not the source. Another Amoco employee also testified that, in 1974, Amoco routinely left oil in the soil around a pipeline after fixing a leak. Occasionally, Amoco would excavate the contaminated soil, replace it with clean soil, and then spread (land farm) or deposit the contaminated somewhere else on the property.

---

[2](...continued)
extent and timing of Amoco's knowledge is unclear, the lack of records and the delay in locating even minimal information raise concerns. Other incidents in the record also raise concerns about Amoco's litigation tactics. In a memo concerning a ground penetrating radar report conducted by Amoco, an Amoco employee indicated he had contacted someone about obtaining historical geological data but "management had ordered them to get rid of anything that might cause someone to have any interest in the area in the future. As a result, there was no remaining geological information." Amoco did not produce this report, which supports some of the Bowens' contentions, until the arbitration hearing was underway. Amoco argues that this memo was directed at the geological department and therefore proves nothing regarding its record-keeping practices in the pipeline department. We mention it here as but one example among several that demonstrate Amoco's less than forthcoming approach to this entire matter.

Given this practice, the Bowens argued a contaminated area of soil away from the replaced line was the location where Amoco deposited excavated soil after the 1950 replacement.

Although Amoco changed its initial theory and admitted its lines might be the source of contamination in the soil, it continued to claim no responsibility for the hydrocarbon contamination in the creek. Admitting a small two-barrel leak may have occurred in 1952, Amoco continued to deny any connection to the contamination in the creek. Amoco contended that, despite the contamination in the soil around its pipelines, the hydrocarbon levels in the groundwater did not exceed EPA standards, and because the pollution in the soil was not reaching the water table, it was not reaching the creek. In addition, Amoco continued to refute the Bowens' assertion that soil excavated from around the replaced line in 1950 was deposited in another location; although the record contains various characterizations of this site, Amoco appears to argue it is an old drilling site or the site of a historic pit used by others.

II.    The Arbitration

The Bowens' case was tried to a panel of three arbitrators in August 1999. The parties agreed to use the Rules for Non-Administered Arbitration of Business Disputes (NABD), but they also agreed to modify these rules to expand the scope of judicial review. Specifically, the parties agreed that both would have the right

to appeal any arbitration award to the district court within thirty days "on the grounds that the award is not supported by the evidence." They also agreed that the district court's ruling "shall be final."

On October 18, 1999, the arbitration panel granted the following relief: (1) $3,032,000 to be deposited in an escrow fund for the use and benefit of a special master responsible for supervising the abatement of the contamination on the Bowens' property; (2) $100,000 for the diminution in property value; (3) $1,200,000 for annoyance, inconvenience, and aggravation; (4) $1,000,000 in punitive damages; and (5) $41,000 for the costs of investigation and mitigation. One panel member dissented, objecting to the escrow fund for abatement and punitive damages award. Under the Federal Arbitration Act (FAA), 9 U.S.C. § 9, the Bowens then filed a motion for confirmation of the arbitration award in district court. Amoco responded by filing an objection to the confirmation and a motion to vacate the award. In addition, Amoco filed a notice of appeal of the arbitration award pursuant to the modified arbitration rules. Limiting its review to that provided under the FAA, the district court did not apply the parties' expanded judicial standard of review and declined to vacate the award. The court granted the Bowens' motion to confirm the award and affirmed the arbitrators' order awarding the Bowens attorneys fees, costs, and arbitrators' fees. Amoco appeals the district court's order, urging us to vacate the entire award and remand

for a new arbitration, or alternatively to vacate the remediation award and remand the case to district court for review based on the expanded standard of review.

## II. Jurisdiction: Plaintiffs' Motion to Dismiss Appeal

We must first address the Bowens' motion to dismiss for lack of appellate jurisdiction. The Bowens contend the parties' agreement that the district court's "ruling shall be final" forecloses any appellate review. We disagree and deny the motion.

Under § 9 of the FAA, parties must express their intentions regarding judicial confirmation of an arbitration award in their arbitration agreements. 9 U.S.C. § 9. The statute contemplates judicial confirmation of arbitration awards only when "the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration." Id. We have held that this requires some language manifesting the parties' intent–"either explicitly or implicitly"–to have judgment entered on the award. Ok. City Assocs. v. Wal-Mart Stores, Inc., 923 F.2d 791, 795 (10th Cir. 1991); accord Smiga v. Dean Witter Reynolds, Inc., 766 F.2d 698, 705 (2d Cir. 1985). We have also observed that "some courts have found that a finality clause is enough to constitute an agreement to have judgment entered by a federal court under § 9 because this would be the only way to fulfill the parties' intent to make the award final and binding." Ok. City Assocs., 923 F.2d at 794. In this case, the parties'

agreement that the district court's ruling be final may be construed as nothing more than a finality clause expressing their intent to have the district court enter judgment on the arbitration award. Indeed, because the rules chosen by the parties do not include a provision regarding judicial confirmation, the parties had to supplement the rules to ensure judgment be entered on the award under the FAA.

In addition, although parties to an arbitration agreement may eliminate judicial review by contract, their intention to do so must be clear and unequivocal. See Dep't of Air Force v. Fed. Labor Relations Auth., 775 F.2d 727, 733 (6th Cir. 1985) (holding parties did not completely waive right to appeal when agreement specified "further rights of appeal are hereby waived except that all articles must be in conformance with law and Executive Order"); Aerojet-Gen. Corp. v. Am. Arbitration Ass'n, 478 F.2d 248, 251 (9th Cir. 1973) ("While it has been held that parties to an arbitration can agree to eliminate all court review of the proceedings, the intention to do so must clearly appear." (citations omitted)). The language in the parties' agreement does not clearly evince their intent to waive appellate review. In fact, the very statute from which we derive our jurisdiction, 28 U.S.C. § 1291, grants appellate courts jurisdiction from "all final decisions of the district courts." Hence, by agreeing that the district court's ruling shall be final, the parties have merely reinforced the appellate jurisdiction conferred by § 1291. The

Bowens' best argument is that the word "final" is ambiguous, but courts have long recognized the common law rule that ambiguous language be construed against the drafter of that language. Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995). Having suggested the modified language, the Bowens may not now "claim the benefit of the doubt." Id. at 63.

### III. Standard of Review

In reviewing a district court's decision concerning a motion to vacate an arbitration award, we review questions of law de novo. Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co., 119 F.3d 847, 849 (10th Cir. 1997); ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995). If the district court makes any findings of fact in ruling on the motion, we review its factual findings for clear error. Denver & Rio Grande W. R.R. Co., 119 F.3d at 849. Our review of the arbitration panel's decision under the FAA and the few judicially created exceptions is, however, far more limited.

Although the FAA does not create independent federal jurisdiction, the Supreme Court has held that the Act creates a body of substantive federal law governing arbitration agreements within its coverage. Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270-72 (1995); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983); accord Foster v. Turley, 808 F.2d 38, 40 (10th Cir. 1986). Moreover, the Act creates no new rights "'except a

-12-

remedy to enforce an [arbitration] agreement.'" Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 220 n.7 (1985) (quoting legislative history). The Act applies to a written arbitration clause in "a contract evidencing a transaction involving commerce," 9 U.S.C. § 2, a requirement broadly interpreted to correspond with Congress's power under the Commerce Clause. Allied-Bruce Terminix Cos., 513 U.S. at 269-70; Foster, 808 F.2d at 40. The district court ordered the arbitration in the case before us pursuant to a right-of-way agreement, a transaction involving pipelines for the interstate transportation of crude oil. The FAA therefore applies to the parties' dispute.

Our review of the arbitration panel's decision under the FAA is strictly limited; this highly deferential standard has been described as "among the narrowest known to the law." ARW Exploration Corp., 45 F.3d at 1462 (internal quotation marks omitted). In consenting to arbitration, "'a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" Brown v. Coleman Co., 220 F.3d 1180, 1182 (10th Cir. 2000) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991)). We employ this limited standard of review and exercise caution in setting aside arbitration awards because one "purpose behind arbitration agreements is to avoid the expense and delay of court proceedings." Foster, 808 F.2d at 42. A court may not, therefore, independently judge an

arbitration award.  Ormsbee Dev. Co. v. Grace, 668 F.2d 1140, 1147 (10th Cir. 1982).

Mindful of the strong federal policy favoring arbitration, a court may grant a motion to vacate an arbitration award only in the limited circumstances provided in § 10 of the FAA, 9 U.S.C. § 10, or in accordance with a few judicially created exceptions, Denver & Rio Grande W. R.R. Co., 119 F.3d at 849.  Under the FAA, vacation is proper in certain instances of fraud or corruption, arbitrator misconduct, or "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  Although Amoco does not allege fraud or misconduct, it does argue that the arbitrators exceeded their powers.  In addition, Amoco argues the arbitration panel's decision is in "manifest disregard of the law," a judicially crafted exception to the general rule that arbitrators' "erroneous interpretations or applications of law are not reversible."  ARW Exploration Corp., 45 F.3d at 1463 (citing Wilko v. Swan, 346 U.S. 427, 436-37 (1953), overruled on other grounds, Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477 (1989)).  We have interpreted manifest disregard of the law to mean "willful inattentiveness to the governing law."  ARW Exploration Corp., 45 F.3d at 1463 (internal quotation marks omitted).  Requiring more than error or misunderstanding of the law, id., a finding of manifest disregard means the record

-14-

will show the arbitrators knew the law and explicitly disregarded it, Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 240 (1st Cir. 1995).  Under traditional standards of review, we would, therefore, review Amoco's claims to determine whether the arbitrators exceeded their powers or rendered a decision in manifest disregard of the law.[3]

Amoco argues, however, that the parties in this case contracted for expanded judicial review in agreeing that the arbitration award would be appealable if "not supported by the evidence."  The district court did not apply this expanded standard, deciding instead that parties may not alter the traditional standards of review by contract.  Emphasizing the policies behind the FAA, Amoco argues the district court erred and we should apply the contractually created standard.  Although Amoco presents a difficult question, we conclude the purposes behind the FAA, as well as the principles announced in various Supreme Cases, do not support a rule allowing parties to alter the judicial process by private contract.

The only two circuits to definitively decide this issue have, however, held

---

[3] The public policy exception is not available in this case because it applies specifically to contract disputes.  Under this exception, a court determines "whether the specific terms contained in [the contract] violated public policy by creating an explicit conflict with other laws and legal precedents."  Seymour v. Blue Cross/Blue Shield, 988 F.2d 1020, 1024 (10th Cir. 1993) (citations and internal quotation marks omitted).  Because the case before us involves tort claims, this exception does not apply.

that private parties may agree to expand the judicial standard of review.[4] Lapine Tech. Corp. v. Kyocera Corp., 130 F.3d 884, 887-890 (9th Cir. 1997); Gateway Tech., Inc. v. MCI Telecomms. Corp., 64 F.3d 993, 996-97 (5th Cir. 1995). Both the Fifth and the Ninth Circuits were persuaded by language in Supreme Court decisions emphasizing, in particular, the FAA's purpose of "'ensuring that private agreements to arbitrate are enforced according to their terms.'" Lapine, 130 F.3d at 888 (quoting Volt Info. Sciences v. Bd. of Trustees, 489 U.S. 468, 478-79 (1989)); accord Gateway, 64 F.3d at 996-97 (describing the FAA's judicial review standard as a "default standard of review"). Although, as the Ninth Circuit acknowledged, agreeing to the judicial standard of review is not the same as agreeing to the rules governing the scope of arbitration, the court concluded the two are "inexorably intertwined" and could find "no sufficient reason to pay less respect to the review provision than . . . to the myriad of other agreements which the parties have been pleased to make." Lapine, 130 F.3d at 889. In a splintered decision, the court decided the opposite result would be contrary to Congress's intent in enacting the FAA "under the guise of deference to the arbitration concept." Id.

---

[4] In an unpublished opinion, the Fourth Circuit also agreed with the Fifth Circuit, concluding the district court should have applied the expanded standard of review. Syncor Int'l Corp. v. McLeland, No. 96-2261, 1997 WL 452245, at *6 (4th Cir. Aug. 11, 1997) (unpublished opinion).

-16-

In resolving conflicts among the FAA, state law, and parties' agreements, the Supreme Court has repeatedly acknowledged that Congress's intent in enacting the FAA was to ensure judicial enforcement of private arbitration agreements. See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995) ("[C]ourts are bound to interpret contracts in accordance with the expressed intentions of the parties . . . ."); Volt Info. Sciences, Inc. v. Bd. of Trustees, 489 U.S. 468, 479 (1989) ("Just as [parties] may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which the arbitration will be conducted." (citation omitted)); Dean Witter Reynolds, Inc., 470 U.S. at 219-20 (observing the FAA's legislative history "makes clear that its purpose was to place an arbitration agreement upon the same footing as other contracts, where it belongs, and to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate" (citation and internal quotation marks omitted)). When Congress passed the Act in 1925, it did so with the primary goal of changing the judiciary's refusal to enforce arbitration clauses in private contracts. Allied-Bruce Terminix Cos., 513 U.S. at 270-71. With the passage of the FAA, Congress intended to "make arbitration agreements as enforceable as other contracts, but not more so." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12 (1967).

Guided by the FAA's underlying purpose and the essentially contractual

nature of arbitration, the Court has held, for example, that parties may agree to conduct arbitration under procedural rules different from the FAA. Volt Info. Sciences, Inc., 489 U.S. at 478-79. The Court has also held district courts must compel arbitration even if arbitrable and nonarbitrable claims are pleaded in the same complaint despite the potential negative effects on efficient dispute resolution. Dean Witter Reynolds, Inc., 470 U.S. at 223-24. Parties may even agree to submit questions concerning arbitrability to the arbitrators. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942-43 (1995). The contractual nature of arbitration is, therefore, well established. Parties are free to structure their arbitration agreements as they wish, and our decision today must further the FAA's primary policy ensuring judicial enforcement of private agreements to arbitrate.

We disagree, however, with the Fifth and Ninth Circuits' conclusion that the Supreme Court precedent emphasizing the FAA's primary purpose compels enforcement of contractual modifications of judicial review. Although the Court has emphasized that parties may "specify by contract the rules under which [ ] arbitration will be conducted," Volt Info. Sciences, Inc., 489 U.S. at 479, it has never said parties are free to interfere with the judicial process. As both the concurring and dissenting opinions in Lapine acknowledge, parties may determine by contract what issues to arbitrate and what rules will govern arbitration, but no

-18-

authority clearly allows private parties to determine how federal courts review arbitration awards. 130 F.3d at 891 (Kozinski, J., concurring and Mayer, J., dissenting). To the contrary, through the FAA Congress has provided explicit guidance regarding judicial standards of review of arbitration awards. Prima Paint Corp., 388 U.S. at 405. Moreover, if parties desire broader appellate review, "they can contract for an appellate arbitration panel to review the arbitrator's award." Chicago Typographical Union v. Chicago Sun-Times, Inc., 935 F.2d 1501, 1504-05 (7th Cir. 1991). The decisions directing courts to honor parties' agreements and to resolve close questions in favor of arbitration simply do not dictate that courts submit to varying standards of review imposed by private contract.

Even Volt, the case often cited in support of contractually created standards of review, does not dictate this result. In determining whether the FAA pre-empted a state procedural rule, to which the parties had agreed by contract, the Court focused on whether the state rule conflicted with the federal policies and objectives of the FAA. 489 U.S. at 477-78. The Court held parties may agree that procedural rules outside the FAA will govern arbitration proceedings because the federal policy favoring arbitration does not favor arbitration under a particular set of procedural rules. Id. at 478-79. Enforcing the parties' contract therefore "[gave] effect to the contractual rights and expectations of the parties *without*

-19-

*doing violence to the policies* behind . . . the FAA." Id. at 479 (emphasis added).
Conversely, the FAA pre-empts state rules that contravene the policies behind the
FAA. See, e.g., Southland Corp. v. Keating, 465 U.S. 1, 10 (1984) (holding FAA
pre-empts state laws that "require a judicial forum for the resolution of claims
which the contracting parties agreed to resolve by arbitration"). The Court's
analysis therefore suggests that the FAA is more than a collection of default rules,
which parties may alter with complete discretion. The key question is whether the
alternate rule conflicts with federal policies furthered by the FAA.

Unlike the contract clause at issue in Volt, the contract clause in this case
threatens to undermine the policies behind the FAA. We would reach an illogical
result if we concluded that the FAA's policy of ensuring judicial enforcement of
arbitration agreements is well served by allowing for expansive judicial review
after the matter is arbitrated. The FAA's limited review ensures judicial respect
for the arbitration process and prevents courts from enforcing parties' agreements
to arbitrate only to refuse to respect the results of the arbitration. These limited
standards manifest a legislative intent to further the federal policy favoring
arbitration by preserving the independence of the arbitration process. Unlike § 4
of the FAA, which allows parties to petition a federal court for an order
compelling arbitration "in the manner provided for in [the] agreement," the
provisions governing judicial review of awards, 9 U.S.C. §§ 10-11, contain no

-20-

language requiring district courts to follow parties' agreements.

Not surprisingly, the FAA's narrow standards reflect the Supreme Court's well-established view of the relationship between arbitration and judicial review: "[B]y agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)); see also First Options of Chicago, 514 U.S. at 942 (noting parties have the right to a judicial decision on the merits but "where the party has agreed to arbitrate, he or she, in effect, has relinquished much of that right's practical value").[5]  Contractually expanded standards, particularly those that allow for factual review, clearly threaten to undermine the independence of the arbitration process and dilute the finality of arbitration awards because, in order for

_____

[5] In considering issues involving arbitration of collective bargaining agreements, the Court has often cautioned that courts should not second-guess an arbitrator's decision.  See, e.g., W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 764 (1983).  Although these disputes are governed by the labor statutes rather than the FAA, the Court's explanation for such limited judicial review in this context is applicable to arbitration in general: "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrators' view of the facts and of the meaning of the contract that they have agreed to accept.  Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987).

-21-

arbitration awards to be effective, courts must not only enforce the agreements to arbitrate but also enforce the resulting arbitration awards.

Moreover, expanded judicial review places federal courts in the awkward position of reviewing proceedings conducted under potentially unfamiliar rules and procedures.[6]  Under either expanded legal or expanded factual standards, the reviewing court would be engaging in work different from what it would do if it had simply heard the case itself.  Lapine, 130 F.3d at 891 (Kozinski, J., concurring).  The Eighth Circuit has also recognized this potential problem: "We have served notice that where arbitration is contemplated the courts are not equipped to provide the same judicial review given to structured judgments defined by procedural rules and legal principles.  Parties should be aware that they get what they bargain for and that arbitration is far different from adjudication."  UHC Mgmt. Co. v. Computer Sciences Corp., 148 F.3d 992, 998 (8th Cir. 1998) (internal quotation marks omitted).  Because parties may not force reviewing courts to apply unfamiliar rules and procedures, see Agfa-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1525 (7th Cir. 1989), expanded judicial

---

[6] We recognize, of course, that even under expanded standards of review, arbitration reduces the burden on district courts.  Without an independent basis for federal court jurisdiction, the parties could not petition the district court to compel arbitration or to enter judgment on an award.  See Lapine, 130 F.3d at 889-90.  Reviewing an arbitration award is certainly less work than hearing the entire case pursuant to diversity or federal question jurisdiction.

-22-

review would threaten the independence of arbitration and weaken the distinction between arbitration and adjudication. Arbitrators are chosen for their specialized experience and knowledge, which enable them to fashion creative remedies and solutions that courts may be less likely to endorse.[7] Expanded judicial review therefore places a court in the position of reviewing that which it would not do and reduces arbitrators' willingness to create particularized solutions for fear the decision will be vacated by a reviewing court. See Hans Smit, Contractual Modification of the Scope of Judicial Review of Arbitral Awards, 8 Am. Rev. Int'l Arb. 147, 151-52 (1997).

Although we are the first circuit to hold that parties may not contract for an expanded standard of review, two circuits have indicated they too would reject contractually expanded standards. In dicta, both the Seventh and Eighth Circuits have expressed disapproval of contractually expanded standards of review, acknowledging the independence of the arbitration process and noting parties may

---

[7] In addition, expanded judicial review would require arbitrators to issue written opinions with conclusions of law and findings of fact, further sacrificing the simplicity, expediency, and cost-effectiveness of arbitration. Rather than providing a single instance of dispute resolution with limited review, arbitration would become yet another step on the ladder of litigation. The drafters of the Revised Uniform Arbitration Act (RUAA) recognized these concerns, noting that expanded judicial review would allow parties a "'second bite at the apple' on the merits [which] effectively eviscerates arbitration as a true alternative to traditional litigation." RUAA § 23, cmt. B.1. Given these concerns, as well as others, the drafters chose not to adopt a provision for "opt-in review," which would permit parties to agree by contract for expanded judicial review.

contract for an appellate arbitration panel should they desire more review.[8]  UHC

Mgmt. Co., 148 F.3d at 997-98; Chicago Typographical Union, 935 F.2d at 1504-

05.  We agree and hold that parties may not contract for expanded judicial review

of arbitration awards.  We therefore proceed to review the arbitration award in the

case before us under the FAA and "manifest disregard of justice" standards.

### IV.  Arbitration Panel's Jurisdiction to Order Abatement

Under Oklahoma statutes, the Oklahoma Corporation Commission (OCC)

is vested with "exclusive jurisdiction" over many activities and properties

affected by oil and gas, including "construction and operation of pipelines and

associated rights-of-way" and related site remediation.  Okla. Stat. Ann. tit. 17, §

52(A)(1)(h) & (A)(2); Okla. Stat. Ann. tit. 52, § 139(B)(2).  Amoco argues that

this statute abrogates the arbitration panel's jurisdiction over the Bowens'

equitable request for abatement of the hydrocarbon contamination.  Amoco

argues that, because the arbitration panel did not have jurisdiction to order

---

[8] The Seventh Circuit suggested parties may not contract for expanded judicial standards of review because "federal jurisdiction cannot be created by contract."  Chicago Typographical Union, 935 F.2d at 1505.  The argument that expanded standards of review create federal jurisdiction recognizes the problem that, under contractually created standards, courts would vacate awards they would not otherwise vacate and rely on grounds not available under the FAA or federal common law.  Because we hold that, in the absence of clear authority to the contrary, parties may not interfere with the judicial process by dictating how the federal courts operate, we need not decide whether contractually created standards impermissibly attempt to create federal jurisdiction.

-24-

cleanup, they exceeded their powers and acted in manifest disregard of the law.

We have recognized the well-settled rule that any doubt about the arbitrability of an issue should be resolved in favor of arbitration and that arbitrators have broad authority in fashioning remedies: "Parties who agree to submit matters to arbitration are presumed to agree that everything, both as to law and fact, necessary to render an ultimate decision is included in the authority of the arbitrators." Ormsbee Dev. Co. v. Grace, 668 F.2d 1140, 1146 (10th Cir. 1982); see also Continental Materials Corp. v. Gaddis Mining Co., 306 F.2d 952, 954 (10th Cir. 1962) ("[T]he jurisdiction to make [arbitration] awards is derived from the agreement of submission . . . ."). The arbitrators' power to award equitable relief is also well established. Gilmer, 500 U.S. at 32; accord Brown v. Coleman Co., 220 F.3d 1180, 1183-84 (10th Cir. 2000). In response to the Bowens' objection to Amoco's motion to compel arbitration of all issues, Amoco argued–and the district court agreed–that the arbitration panel could grant injunctive relief and remediation, a position Amoco advocated throughout the arbitration and only now wishes to abandon.

Furthermore, what "exclusive jurisdiction" means under the Oklahoma statutes is not entirely clear. The language is the product of several 1993 amendments and no post-amendment case squarely addresses its meaning. The Bowens argue that "exclusive jurisdiction" only refers to the OCC's jurisdiction

relative to other agencies, not courts. Case law prior to 1993 provides some support for this argument. Prior to 1993, the Oklahoma Supreme Court held that the OCC's exclusive jurisdiction over certain oil and gas activities was implicit in the statute and precluded other *agency* review. Matador Pipelines, Inc. v. Okla. Water Res. Bd., 742 P.2d 15, 17 (Okla. 1987). In addition, the state appellate court has concluded that a district court's exercise of jurisdiction over a nuisance claim "does not prevent the [OCC] from *proceeding* to abate existing contamination." Union Texas Petroleum Corp. v. Jackson, 909 P.2d 131, 139 (Okla. Ct. App. 1995) (emphasis added) (under pre-1993 statutes).

But Oklahoma courts have not yet decided that a district court lacks all jurisdiction to order a cleanup when the OCC has not yet exercised its jurisdiction. The case cited by Amoco, Schneberger v. Apache Corp., 890 P.2d 847 (Okla. 1995), does not support the conclusion that courts lack jurisdiction; the Schneberger court merely mentioned in recounting the facts of the case that the OCC had "exercised its exclusive jurisdiction on pollution matters and ordered a cleanup." Id. at 849. Such a passing reference is not a statement that Oklahoma courts would conclude the statutory language forecloses their jurisdiction.

Furthermore, the Oklahoma Supreme Court has applied the public-rights doctrine as articulated by the U.S. Supreme Court in determining how to

-26-

apportion jurisdiction between the OCC and the district courts. Tenneco Oil Co. v. El Paso Natural Gas Co., 687 P.2d 1049, 1053-54 (Okla. 1984). Under the doctrine, Congress may commit "'matters arising between the Government and persons subject to its authority'" to nonjudicial executive bodies but "'[p]rivate-rights disputes . . . lie at the core of the historically recognized judicial power.'" Id. (quoting Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 67, 70 (1982)). In Tenneco, the Oklahoma court recognized that "the liability of one individual to another under the law" is a private right and held that Tenneco sought equitable relief for a private right, which was "not an attack upon the public rights function of the [OCC] i.e. to regulate and administer the conservational laws and policies of the sovereign state." Id.

Citing Tenneco, we have held that an action under Oklahoma law to recover damages to property and water caused by the drilling of an oil well is a private rights dispute properly within the jurisdiction of the district court. Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1378 (10th Cir. 1989) (analyzing the question of "primary jurisdiction"). Although these cases do not consider the 1993 amendment to the Oklahoma statute, they are persuasive evidence that the meaning of the OCC's "exclusive jurisdiction" is far from clear. Furthermore, the rules under which the arbitration was conducted clearly provide that the arbitrators have the power to decide challenges to their jurisdiction.

NABD, R. 8. Despite this provision, Amoco chose not to challenge their jurisdiction to order abatement before or during arbitration. We therefore hold the arbitration panel did not exceed its powers or act in manifest disregard of the law in ordering cleanup of the Bowens' property.

## IV. Double Recovery: Damages and Abatement

Even if the arbitration panel had jurisdiction to grant injunctive relief, Amoco argues the three-million-dollar escrow fund is in manifest disregard of Oklahoma law, which prohibits double recovery for the same injury and limits monetary damages to the diminished value of the land. See Schneberger, 890 P.2d at 849-52. Although a nuisance action may include claims for both permanent and temporary damages, double recovery for the same damage is not allowed. Houck v. Hold Oil Corp., 867 P.2d 451, 461 (Okla. 1993) (tort action for recovery of damage caused by drilling oil wells); Briscoe v. Harper Oil Co., 702 P.2d 33, 36-37 (Okla. 1985) (private nuisance action). If a plaintiff alleges both kinds of damage, "a defendant can in no event be held liable for more than the total diminution in reasonable market value assuming the temporary injuries were left standing or unrestored." Houck, 867 P.2d at 461.

In addition to awarding $100,000 in damages for the diminished value of the Bowens' land, the arbitrators also set up a three-million-dollar escrow fund for the abatement of the nuisance. Amoco argues that the two awards constitute

-28-

double recovery in manifest disregard of state law. Conversely, the Bowens argue the escrow fund is an equitable remedy facilitating cleanup rather than an award of damages constituting double recovery under Oklahoma law. We agree that the escrow fund is an equitable remedy, rather than a legal award of damages. The arbitration panel appointed a special master to administer the funds and oversee the abatement plan, which must be submitted to the OCC for approval. Should the abatement cost less than expected, Amoco will receive any remaining funds. Because Oklahoma cases precluding double recovery do not explicitly address equitable remedies, the arbitration panel did not act in manifest disregard of state law.[9]

Although Amoco's legal arguments are not without merit, the written order for the arbitration award does not reveal that the arbitrators deliberately disregarded Oklahoma law. Short of some evidence of "willful inattentiveness to the governing law," we may not question their conclusions. ARW Exploration

---

[9] The dissenting arbitrator raised yet another issue regarding the escrow fund. He argued the escrow fund is not what it appears. Although the majority set up the fund in order to "abate" the nuisance, the dissenter argued no present nuisance exists so the fund is really a damages award for cleanup of a historic pipeline leak. But although some Oklahoma precedent supports the dissenting arbitrator's position, contrary precedent also supports the majority arbitrators' approach. Compare Atchison T. & S.F. Ry. Co. v. Kelley, 266 P. 775, 776 (Okla. 1928) (holding the injury itself is not the nuisance, even if it can be cleaned up, because only the cause of the damage constitutes a nuisance), with Briscoe, 702 P.2d at 36 ("Temporary damages in the context of an oil and gas nuisance are by definition abatable.").

Corp. v. Aguirre, 45 F.3d 1455, 1463 (10th Cir. 1995).  Our limited standard of review requires more than error or misunderstanding in legal reasoning.  Id.

In addition, we have observed that "courts favor the arbitrator's exercise of [ ] broad discretion in fashioning remedies."  Campo Machining Co. v. Local Lodge No. 1926, 536 F.2d 330, 334 (10th Cir. 1976).  We have also acknowledged that arbitrators have broad equity powers provided the rules governing the arbitration allow equitable relief.  Brown v. Coleman Co., 220 F.3d 1180, 1183 (10th Cir. 2000); accord Willoughby Roofing & Supply Co. v. Kajima Int'l, Inc., 776 F.2d 269, 270 (11th Cir. 1985) (noting doubts regarding the authority to award certain remedies should be resolved in favor of the arbitrator).  Both parties, as well as the district court judge, concluded the arbitration panel had the power to order injunctive relief and remediation.  We will not second-guess their judgment.

## V.  Punitive Damages

Amoco also contends the arbitration panel lacked the authority to award punitive damages and, alternatively, awarded punitive damages in manifest disregard of Oklahoma law.  In addition, Amoco argues the limited judicial review of the punitive damages awarded by the arbitration panel violates due process.  We disagree with all three arguments.

The first argument, that the panel exceeded its powers in awarding

-30-

punitive damages, is without merit in light of the Supreme Court's decision in Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995). In Mastrobuono, the Court resolved a conflict between state law preventing arbitrators from awarding punitive damages and the parties' arbitration agreement, which adopted arbitration rules allowing arbitrators to award "damages and other relief." Id. at 61. Noting the federal policy favoring arbitration, the Court concluded the arbitration agreement and rules contemplated punitive damages as a remedy and the award should be enforced despite contrary state law. Id. at 61-62. In the case before us, the parties agreed to be governed by rules that authorize "any remedy or relief which the Tribunal deems just and equitable and within the scope of the agreement of the parties." NABD, R. 13.1. Given the broad scope of this rule, the arbitrators did not exceed their powers in awarding punitive damages. Indeed, the language "any remedy or relief" is even broader than the language interpreted by the Supreme Court and clearly contemplates punitive damages. See Raytheon Co. v. Automated Bus. Sys., Inc., 882 F.2d 6, 9-12 (1st Cir. 1989) (holding rule similar to NABD rule was broad enough to include punitive damages); accord Lee v. Chica, 983 F.2d 883, 887-89 (8th Cir. 1993); see also Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 710 (7th Cir. 1994) ("In arbitrations governed by [the FAA], arbitrators are authorized to award punitive damages unless the parties have withdrawn that

-31-

power . . . .").

Amoco's contention that the arbitrators acted in manifest disregard of Oklahoma law in awarding punitive damages is also without merit. First, state statutory law provides limitations on exemplary damages awarded by a *jury* and does not clearly address arbitration awards. Okla. Stat. Ann. tit. 23, § 9.1. Second, one subsection of the statute allows a jury to award exemplary damages beyond the limitations provided in other subsections when the jury concludes the "defendant has acted intentionally and with malice toward others." Id. § 9.1(D)(1). As the panel's written order reflects, the arbitrators awarded punitive damages based on several factors, including Amoco's egregious conduct prior to and after the discovery of contamination, Amoco's awareness and blatant disregard of the pollution, and Amoco's *concealment* of the pollution from the Bowens and the OCC. In light of these findings, we conclude the arbitration panel did not act in manifest disregard of the law in awarding punitive damages.[10]

Finally, we disagree with Amoco's contention that the limited judicial

_____

[10] In addition, the Oklahoma statute provides for punitive damages in the amount of actual damages when the jury concludes the defendant acted recklessly. Okla. Stat. Ann. tit. 23, § 9.1(B)(2). The panel's award of $1,000,000 in punitive damages falls short of the $1,200,000 awarded for annoyance, inconvenience, and aggravation, which constitutes "a separate and distinct element of damage" under Oklahoma law. Thompson v. Andover Oil Co., 691 P.2d 77, 83 (Okla. Ct. App. 1984). The arbitrators' written findings clearly support the conclusion that Amoco acted recklessly.

-32-

review of punitive damage awards by arbitrators violates due process. As we have already discussed at length, Amoco not only voluntarily entered into arbitration, but also petitioned the district court to compel arbitration. Before asking the district court to compel arbitration, Amoco was aware that the Bowens' cause of action included a claim for exemplary damages. In addition, Amoco agreed to be governed by the broad language in the arbitration rules authorizing the granting of "any remedy or relief." Amoco may not now oppose the very process it advocated and to which it voluntarily submitted. See Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1063-64 (9th Cir. 1991). Because we conclude that Amoco is essentially foreclosed from arguing a due process violation, we need not decide whether arbitration constitutes state action. See Davis v. Prudential Sec. Inc., 59 F.3d 1186, 1190-92 (11th Cir. 1995) (holding arbitration is a private, voluntary proceeding that does not constitute state action).

We recognize, of course, that this case presents the unique situation in which the parties contracted for an expanded judicial standard of review, which was later invalidated. When the parties agreed to arbitrate all claims, including the punitive damages claim, they also agreed to the added security of a broader scope of judicial review. Our response to this concern is twofold. First, Amoco petitioned the district court to compel all claims to arbitration *before* agreeing to an expanded judicial standard of review; the Bowens' claim for exemplary

damages did not therefore deter Amoco from arguing the entire matter should be submitted to arbitration.  Second, because the arbitration rules adopted by the parties required the arbitration panel to detail the reasoning behind the award, NABD R. 13.2, even our limited review has produced ample evidence in support of the panel's award of punitive damages.

We therefore AFFIRM the district court's confirmation of the arbitration award.