**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 21, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES F. ABBOTT, an individual;
CHARLES F. ABBOTT, P.C., A
professional Corporation,

      Plaintiffs/Counter-Defendants -
Appellants,

v.

LAW OFFICE OF PATRICK J.
MULLIGAN, a professional corporation;
PATRICK J. MULLIGAN, an individual,

      Defendants/Counter-Claimants -
Appellees.

No. 10-4113
(D. Utah)
(D.C. No. 2:06-CV-00593-DB)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **McKAY**, and **O'BRIEN**, Circuit Judges.

---

Charles Abbott and Patrick Mulligan, both attorneys, entered into an agreement to

jointly handle litigation arising from the Fen-Phen national class action settlement.

Eventually a dispute arose over the terms of their contract when Mulligan discovered

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

Abbott was keeping some cases for himself and referring others to a different attorney, who agreed to pay him a greater share of any recoveries. A three-member arbitration panel was convened under the Federal Arbitration Act (FAA) to resolve the dispute. Both men were granted relief but the panel determined the contract was intended to be exclusive, resulting in a substantial award to Mulligan based on the fees improperly kept by Abbott or paid to the third attorney.[1] Abbott appeals from the district court's refusal to vacate the damages award in favor of Mulligan.

Abbott claims the arbitration panel exceeded its authority in a manifest disregard of Utah law by awarding Mulligan his gross, rather than net, profits. He also urges us to vacate the award because an exclusive referral contract such as this one violates public policy as evidenced by the American Bar Association's Model Rules and the Utah Rules of Professional Conduct. We AFFIRM.[2]

## BACKGROUND

Fenfluramine, or Fen-Phen, a diet pill, was taken off the market on September 15, 1997, because it caused heart valve damage and a lung condition known as primary pulmonary hypertension (PPH). Following national claims from persons injured by the pill, a global settlement was reached through multi-district proceedings in Philadelphia.

Fen-Phen clients fall into three categories under the terms of the class action settlement.[3] "The settlement allowed claimants to 'opt-in' to the settlement, where, if

---

[1] One member of the panel dissented and would have denied Mulligan relief.

[2] Our jurisdiction derives from 9 U.S.C. § 16(a)(3) and 28 U.S.C. § 1291.

[3] In December 1999, a jury awarded five Mississippi plaintiffs $150 million

their claim passed audit, they would receive a settlement amount based on a 'matrix' grid. Alternatively, claimants could 'opt-out,' meaning they could reject the matrix benefits, and file an individual lawsuit against the manufacturer . . . ." (R. Vol. I at 91 n.2.) A third subset of clients, the PPH subset, was not eligible for settlement proceeds and could only pursue individual lawsuits. The opt-in cases were the easiest to complete and presented the lowest risk to an attorney taking the case. The other two types of cases required full litigation of claims.

Mulligan, a Texas plaintiffs' attorney, and Abbott, a Utah plaintiffs' attorney, entered into an Attorney Association Agreement (the Agreement) in 2001 to "jointly pursue obtaining Fen-Phen Clients who qualify for benefits under the [Settlement] and/or who elect to opt out of said settlement."[4] (*Id*. at 28.) Abbott, designated as the "Consulting Attorney," was to "make all reasonable efforts" to retain as many qualified clients as possible. (*Id*.) His responsibilities included advertising for prospective clients,

---

in damages arising from their use of American Home Products's ("AHP") diet drugs . . . commonly known as Fen Phen. AHP entered into a settlement agreement to pay $399 million to approximately 1500 claimants. This settlement, known now as "Fen Phen I," relied upon the claimants' attorneys to gather proof that their clients had taken Fen Phen.

In December 2000, AHP entered into a second settlement, known as "Fen Phen II," in which it agreed to pay $350 million to an additional 1500 claimants. This settlement was processed in the same manner as the Fen Phen I settlement, with the exception that AHP received copies of the proof that each claimant had taken the drugs.

*United States v. Arledge*, 553 F.3d 881, 886 (5th Cir. 2008).

[4] Although the Agreement was not memorialized in a document until April 2002, the arbitration panel found the parties had entered into the Agreement in February 2001.

preliminary screening of clients and arranging medical tests for qualified clients, including echocardiograms. He would then refer the clients to Mulligan, designated "Lead Trial Counsel," to work the cases. (*Id.*) Abbott's share of the fees varied depending on whether he or Mulligan paid the initial costs of advertising and an initial echocardiogram. Abbott was to receive 1/3 of Mulligan's total fee when he paid those costs and only 1/4 of the total fee when Mulligan paid the expenses.

The Agreement contained an arbitration clause directing all disputes to be resolved "at the election of any party . . . by binding arbitration pursuant to the Federal Arbitration [A]ct" under the American Arbitration Association's rules for commercial arbitration. (*Id.* at 30.) The arbitration clause specified it was enforceable "pursuant to the substantive federal laws established by the Federal Arbitration Act." (*Id.*) The choice of law provision designated Utah law as the operative substantive law.

From February 2001 to November 2001, Abbott referred all Fen-Phen clients exclusively to Mulligan. In November, Abbott began retaining some opt-in clients[5] and referring some of the opt-out clients to another attorney. In 2006, Mulligan, after inquiring about a specific case, discovered Abbott's self-dealing and started withholding Abbott's portion of fees earned under the Agreement. Abbott sued to recover his portion of the fees. Mulligan counterclaimed, arguing the Agreement was exclusive and Abbott had breached it by "cherry picking" Fen-Phen clients for himself. (Supp. Appx. at 666.)

_____

[5] Although Abbott claims he did this based on the clients' best interests, it appears his discriminating evaluation of client needs was to merely alternate days, keeping clients on "Abbott days" and on the other days referring them to Mulligan.

After just under a year of litigation, Abbott moved the district court to compel arbitration. The court granted the motion.

Between June 23 and June 27, 2008, a panel of three arbitrators conducted evidentiary hearings. The primary issue was whether the contract required Abbott to refer all of his Fen-Phen clients to Mulligan. According to Abbott, the Agreement was not an exclusive referral contract and, if it was, it would violate the Utah Rules of Professional Conduct and must be declared void. Mulligan, quite predictably, maintained the agreement was exclusive and did not violate ethical rules. Abbott also claimed Mulligan had presented insufficient evidence of his damages because he had not shown his net, rather than his gross, losses (as required by Utah law).

Following post-hearing briefing on the issue of damages, the arbitration panel issued an Interim Award. It determined Mulligan withheld just over one million dollars in fees properly due to Abbott and ordered Mulligan to pay them. The panel, however, found the Agreement was intended to be exclusive and presented no ethical problems "because either party could terminate the Agreement." (*Id*. at 136.) It concluded Abbott should have referred all relevant clients to Mulligan but did not. It ordered Abbott to pay Mulligan just under seven million dollars in fees for the clients Abbott either retained or referred to another lawyer. The panel "decline[d] to compel either party to reduce the amount claimed by the amount of expenses that may have been saved." (R. Vol. I at 137.) Adjusted for interest and offsets, the final award required Abbott to pay Mulligan $8,198,208.11 as well as Mulligan's portion of the arbitration fees.

Abbott moved to vacate the arbitration award under 9 U.S.C. § 10. He argued the

arbitration panel "manifestly disregard[ed]" controlling Utah law by awarding gross rather than net damages and the award was "irrational." (R. Vol. I at 105.) Mulligan requested confirmation of the award under 9 U.S.C. § 9. The district court denied Abbott's motion to vacate and granted Mulligan's motion to confirm, concluding the arbitration panel's ruling evidenced, at most, a misunderstanding or misapplication of the law.[6] After resolving other pending claims, it issued a final order and judgment.

Abbott filed a Rule 59(e) motion requesting reconsideration. In it, he argued for the first time to the district court that the Agreement, as interpreted by the arbitration panel majority, was void as against public policy because it required Abbott to violate the rules of ethics prohibiting exclusive referral agreements. He contended an exclusive referral agreement is void because it interferes with an attorney's ability to exercise independent judgment and illegally restrains the attorney's ability to practice law and the client's ability to choose an attorney. The district court concluded the argument was untimely and, in the alternative, denied the motion on the merits.

On appeal, Abbott claims the arbitration award to Mulligan should be vacated for three reasons: (1) it resulted from a manifest disregard of the law; (2) the arbitration panel "lacked any rational basis" for the award; and (3) the contract, as interpreted by the panel, violates public policy. (Appellant's Opening Br. at 39.)

---

[6] The district court's order was not final and appealable because claims not subject to arbitration remained for resolution. The district court issued a final order and judgment December 10, 2009, after resolving those claims. Although he had to wait for final judgment in order to appeal, Abbott's appeal deals only with the district court's refusal to vacate the arbitration award under any of his theories.

**DISCUSSION**

"Congress enacted the FAA to replace judicial indisposition to arbitration with a national policy favoring it and placing arbitration agreements on equal footing with all other contracts." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (quotations omitted). "In consenting to arbitration, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001) (quotations omitted). "An application [to vacate an arbitration award] will get streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court." *Hall Street Assocs.*, 552 U.S. at 582.

Under the FAA:

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon **the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title**.

9 U.S.C. § 9 (emphasis added). Section 10 provides:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone

the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.[7]

"Our review of the arbitration panel's decision under the FAA is strictly limited; this highly deferential standard has been described as 'among the narrowest known to the law.'" *Bowen*, 254 F.3d at 932 (quoting *ARW Exploration Corp. v. Aguierre*, 45 F.3d 1455, 1462 (10th Cir. 1995)). Section 10 "provide[s] the FAA's exclusive grounds for expedited vacatur" of an arbitration award. *Hall Street*, 552 U.S. at 584.

A.      Manifest disregard of the law

Abbott claims the arbitration panel exceeded its powers under 9 U.S.C. § 10(a)(4) when it determined Mulligan did not have to prove his net losses as required by Utah law. He asserts Utah law is clear and unequivocal – contract damages must be reduced by the costs of performance. Since the panel "declined" to apply Utah law to the case, Abbott says it acted in manifest disregard of Utah case law. Mulligan counters that the "manifest disregard of the law" standard no longer applies to our review of arbitration awards after *Hall Street*.

The question at issue in *Hall Street* was whether the parties could, by contractual agreement, expand the grounds upon which an arbitration award could be reviewed. 552 U.S. at 578. Hall Street contended the Court's decision in *Wilko v. Swan*, 346 U.S. 427

---

[7] Modification of an arbitration award under 9 U.S.C. § 11 is not at issue.

(1953), creating a judicial ground for vacating arbitration awards in addition to the

grounds provided in 9 U.S.C. § 10, paved the way for contracting parties to do the same.

*Id*. at 584-85. The *Wilko* decision noted "the interpretations of the law by the arbitrators

**in contrast to manifest disregard** are not subject, in the federal courts, to judicial review

for error in interpretation." 346 U.S. at 436-37 (emphasis added). The *Hall Street*

decision rejected the notion that *Wilko* opened the door for parties to contractually

expand the scope of court review of arbitration decisions but declined to address whether

those grounds could be expanded judicially. *Id.* at 584-85. The Court said:

> Hall Street reads [the *Wilko* language] as recognizing 'manifest disregard of the law' as a further ground for vacatur on top of those listed in § 10, and some Circuits have read it the same way. Hall Street sees this supposed addition to § 10 as the camel's nose: if judges can add grounds to vacate (or modify), so can contracting parties.

> But this is too much for *Wilko* to bear. Quite apart from its leap from a supposed judicial expansion by interpretation to a private expansion by contract, Hall Street overlooks the fact that the statement it relies on expressly rejects just what Hall Street asks for here, general review for an arbitrator's legal errors. Then there is the vagueness of *Wilko*'s phrasing.

*Id.* (citations omitted).

> *Hall Street* did not attempt to interpret the language in *Wilko*. Rather, it proposed:

> Maybe the term "manifest disregard" was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them. Or, as some courts have thought, "manifest disregard" may have been shorthand for § 10(a)(3) or § 10(a)(4), the paragraphs authorizing vacatur when the arbitrators were "guilty of misconduct" or "exceeded their powers."

*Id.* at 585 (citations omitted). In the end, however, the Court explicitly stated: "[T]he

FAA confines its expedited judicial review to the grounds listed in 9 U.S.C. §§ 10 and 11

. . . ." *Id*. at 592.

In 2010, the Supreme Court declined an opportunity to clarify *Hall Street* and the

fate of "manifest disregard" as a basis for vacatur under the FAA. In *Stolt-Nielsen S.A. v.*

*AnimalFeeds Int'l Corp.,* -- U.S. --, 130 S. Ct. 1758 (2010), the Court concluded an

arbitration panel exceeded its authority under § 10 when it imposed class arbitration on

the parties under an arbitration agreement that was silent on the issue. Although the

district court had vacated the award, the Second Circuit reversed because it determined

the arbitration panel did not act in manifest disregard of the law. *Id.* at 1766-67. Without

reaching the ultimate issue,[8] the Supreme Court decided the arbitration panel had

exceeded its power under § 10(d) because it had simply "impose[d] its own view of

sound policy regarding class arbitration," even though an arbitrator's role is limited to

interpreting and enforcing a contract. *Id*. at 1767-68 & n.3.

In the wake of *Hall Street*, the circuits have split as to whether manifest disregard

of the law is still a viable ground on which to overturn an arbitration award. According

to the Second, Sixth (in an unpublished decision) and Ninth Circuits, manifest disregard

_____

[8] In a footnote the Court said:

> We do not decide whether manifest disregard survives our decision in *Hall Street* . . ., as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10. AnimalFeeds characterizes that standard as requiring a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it . . . . Assuming, *arguendo*, that such a standard applies, we find it satisfied for the reasons that follow.

130 S. Ct. at 1768 n.3 (quotations omitted).

remains a viable standard because an arbitrator who manifestly disregards the law exceeds his powers under 9 U.S.C. § 10(a)(4). *See Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009) ("We have already determined that the manifest disregard ground for vacatur is shorthand for a statutory ground under the FAA, specifically 9 U.S.C. § 10(a)(4), which states that the court may vacate 'where the arbitrators exceeded their powers . . . .'"); *Stolt-Nielsen SA*, 548 F.3d at 95 ("[The Supreme Court in *Hall Street*] did not, we think, abrogate the "manifest disregard" doctrine altogether . . . . [P]arties do not agree in advance to submit to arbitration that is carried out in manifest disregard of the law. Put another way, the arbitrators have thereby 'exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.' 9 U.S.C. § 10(a)(4)."), *overruled on other grounds*, -- U.S. --, 130 S. Ct. 1758 (2010); *see also Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 Fed. Appx. 415, 419 (6th Cir. 2008) (unpublished) ("In light of the Supreme Court's hesitation to reject the 'manifest disregard' doctrine in all circumstances, we believe it would be imprudent to cease employing such a universally recognized principle. Accordingly, this Court will follow its well-established precedent here and continue to employ the 'manifest disregard' standard.").

In contrast, the Fifth, Eighth and Eleventh Circuits have concluded *Hall Street* left no room for the judicially created doctrine. *Frazier v. CitiFinancial Corp.,* 604 F.3d 1313, 1324 (11th Cir. 2010) ("We hold that our judicially-created bases for vacatur are no longer valid in light of *Hall Street*. In so holding, we agree with the Fifth Circuit that the categorical language of *Hall Street* compels such a conclusion."); *Citigroup Global*

- 11 -

*Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009) ("*Hall Street* unequivocally held that the statutory grounds are the exclusive means for vacatur under the FAA.  Our case law defines manifest disregard of the law as a *nonstatutory* ground for vacatur.  Thus, to the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur, it is no longer a basis for vacating awards under the FAA.") (citation omitted); *Medicine Shoppe Int'l, Inc. v. Turner*, 614 F.3d 485, 489 (8th Cir. 2010) ("Appellants' claims, including the claim that the arbitrator disregarded the law, are not included among those specifically enumerated in § 10 and are therefore not cognizable.").[9]

Prior to *Hall Street*, we (somewhat equivocally), but like a number of other circuits, interpreted the Supreme Court's decision in *Wilko* as creating a judicial ground for vacating arbitration awards in addition to the grounds provided in 9 U.S.C. § 10.  *See Jenkins v. Prudential-Bache Secs., Inc.*, 847 F.2d 631, 633-34 (10th Cir. 1988) ("[F]ederal courts have never limited their scope of review to a strict reading of this statute . . . .").  We permitted vacatur of awards in which the arbitrators had manifestly disregarded the law, without regard to whether such decisions could be stricken under any provision of § 10 of the FAA.  *See MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 827 (10th Cir. 2005) ("In addition [to the grounds provided in § 10], the Supreme Court has held that vacatur is also appropriate when the arbitrator demonstrates a 'manifest

---

[9] The First and Third Circuits so far have declined to reach the issue.  *See Kashner Davidson Sec. Corp. v. Mscisz*, 601 F.3d 19, 22-23 (1st Cir. 2010) ("The continued vitality of the manifest disregard doctrine in FAA proceedings is a difficult and important issue that the courts have only begun to resolve."); *Paul Green Sch. of Rock Music Franchising, L.L.C. v. Smith*, 389 Fed. Appx. 172, 177 (3d Cir. 2010) (unpublished).

disregard' for the law.").

Abbott urges us to follow the Second and Ninth Circuits and modify our precedent[10] to conclude an arbitrator who manifestly disregards the law exceeds his powers under § 10. Mulligan, of course, urges us to expressly abandon "manifest disregard" as did the Fifth, Eighth and Eleventh Circuits. But in the absence of firm guidance from the Supreme Court, we decline to decide whether the manifest disregard standard should be entirely jettisoned. And it is not necessary to do so because this case does not present exceedingly narrow circumstances supporting a vacatur based on manifest disregard of the law.[11]

"Manifest disregard of the law clearly means more than error or misunderstanding with respect to the law." *ARW Exploration Co.*, 45 F.3d at 1463. "It is not enough . . . to show that the panel committed an error -- or even a serious error." *Stolt-Neilson*, 130 S. Ct. at 1767. It requires a party to establish the arbitrator's "willful inattentiveness to the governing law." *Id.*

---

[10] In *Jenkins* we quoted with approval a Second Circuit case, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986), which treated manifest disregard as an extra-statutory ground for judicial review -- one not explicitly or implicitly contained in the FAA. *See Jenkins*, 847 F.2d at 634. However, we did not expressly adopt that approach. Since *Hall Street*, the Second Circuit has "reconceptualized" manifest disregard "as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA," rather than a stand-alone doctrine. *Stolt-Neilson*, 548 F.3d at 94. Abbott invites us to do the same. As it is not necessary to do so to resolve his claims, we decline his invitation.

[11] We note that in *Hall Street*, the Supreme Court observed "the old rule of *ejusdem generis* has an implicit lesson to teach here. Under that rule, when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." 552 U.S. at 586.

Abbott's interpretation of Utah law is not without substance. He correctly contends that, in the majority of cases, Utah law requires calculation of damages to be based on net, rather than gross, profits. *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986) ("A party is entitled to recover only lost net profits. [P]roof of lost gross profits does not afford courts a proper basis for a damage award, where there is no evidentiary basis on which to calculate net profits with reasonable certainty.") (citing *Penelko, Inc. v. John Price Assoc., Inc.,* 642 P.2d 1229 (Utah 1982) and *First Security Bank of Utah, N.A. v. J.B.J. Feedyards, Inc.,* 653 P.2d 591 (Utah 1982)). It is also true that the arbitration panel, without explanation, "decline[d] to compel either party to reduce the amount claimed by the amount of expenses that may have been saved." (R. Vol. I at 137.) Abbott argues "[n]one of Mulligan's briefing to the arbitration panel refuted, contested, or offered any alternative interpretation or clarification of the requirements of Utah law for proving lost profits." (Appellant's Opening Br. at 36.) From that, Abbott claims, the only conclusion to be drawn is that the panel chose to ignore the law in awarding Mulligan's damages. Our role is only to decide whether it manifestly disregarded the law, something substantially different from a misunderstanding or misapplication of the law. The panel's possible adoption of a flawed argument is merely error, not manifest disregard of the law, and is not grounds for reversal under the FAA. *See ARW Exploration Corp.*, 45 F.3d at 1463 ("Manifest disregard of the law clearly means more than error or misunderstanding with respect to the law.") (quotations omitted).

While Abbott is right in stating Mulligan did not address his cited authority,

Abbott fails to recognize Mulligan's alternative arguments that his gross damages were appropriate under Utah law.[12] First, Mulligan argued that any expenses he would have incurred from the opt-in cases were de minimus because under the Agreement Abbott was required to do the initial screening and medical testing, leaving Mulligan the task of merely applying the client's facts to the settlement damages grid.[13] Mulligan also presented evidence to the panel showing he had arranged for sufficient staff and infrastructure to absorb all Abbott's referrals without additional costs. In other words, as to Abbott's referrals, Mulligan maintained his gross profits were equivalent to his net profits. In the alternative, he argued his gross fees were permitted under the Agreement

---

[12] One of Mulligan's arguments was patently wrong. He claims a Colorado case "suggests" Abbott had the burden to prove any offset for expenses. (R. Vol. I at 190.) But Colorado law is irrelevant. Utah law is clear:

> [The party seeking damages], of course, has the burden to produce a sufficient evidentiary basis to establish the fact of damages and to permit the trier of fact to determine with reasonable certainty the amount of lost net profits.
>
> Plaintiffs here presented evidence on gross profit losses only. Their failure to place before the court financial summaries, monthly sales volume breakdowns, costs of sales expenses, or any other overhead expenses from which the trial court could reasonably have calculated plaintiff's lost net profit is fatal to their claim.

*Sawyers*, 722 P.2d at 774-75 (citations omitted).

[13] Abbott described the work he did under the Agreement as follows:

> As outlined in Paragraph 3 of the Agreement, Abbott placed advertising, accepted incoming calls, obtained pharmacy records, arranged for screening and full study echocardiograms ("echos") and a cardiologist's opinion, arranged for right heart catheterizations (for PPH cases), and obtained retainer agreements before turning cases over to Mulligan.

(Appellant's Opening Br. at 8.)

- 15 -

as it provided for joint representation of the clients. The only provision referencing a connection between costs and fees was the provision allowing Abbott to choose to pay the advertising and echocardiogram costs for a 1/3 share, rather than a 1/4 share, of the total fee. Mulligan claimed the costs of services were otherwise irrelevant to the fee split.[14]

Abbott does not directly confront these arguments with specific Utah law or cases denying relief under these circumstances. Instead, he cites to portions of the arbitration transcript[15] to show that the evidence established that there were substantial additional expenses for opt-in cases[16] after referral to Mulligan and even more expenditures on the opt-out cases referred to the third attorney. He also points to the panel's reference (in its Interim Award) to "expenses that *perhaps* may have been avoided" and "expenses that *may have been* saved," (R. Vol. I at 137 (emphasis added)), as the panel's recognition it was allowing gross damages in contravention of Utah law. But conflicting assertions of

---

[14] Mulligan's arguments are not particularly compelling. Under Utah law, even though the Agreement itself did not provide for any fee reduction due to expenses not recovered from clients, these costs are still relevant to a calculation of damages. *See TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929, 931 (Utah 2008) ("Under Utah law it is well established that the injured party in a breach of contract action has a right to damages based upon his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform.") (quotations omitted).

[15] The transcript is not in the record on appeal.

[16] However, those expenses would most likely be recovered from clients. Indeed, the Agreement provided: "RECOVERY OF COSTS: LEAD TRIAL COUNSEL and CONSULTING ATTORNEY shall be entitled to recover costs from the clients out of the clients' portions of settlements." (Appellant's Supp. Appx. at 684.)

what the evidence established and how the law should be applied to those facts only

substantiates the district court's conclusion:

> Here, the evidence shows only that the panel was presented with two opposing views of the law, one by Mr. Abbott and one by Mr. Mulligan, and that it adopted one of those two views. Based on this, at best, all Mr. Abbott has shown is that the majority panel misapplied or misinterpreted Utah law. This provides no basis for a finding of misconduct under § 10 of the FAA.

(R. Vol. II at 415-16.) While the arbitration panel may have "got the law wrong," and

perhaps even "*really* wrong," there is no evidence that it engaged in any type of

egregious or intentional misconduct as is required under the FAA. (*Id*. at 416.) It did not

manifestly disregard the law.

## B.    Irrationality

Abbott argues the arbitration panel "lacked any rational basis"[17] for the award and

therefore exceeded its authority under 9 U.S.C. § 10(d). (Appellant's Opening Br. at 39.)

He claims:

> [T]he panel majority's damage award to Mulligan lacks any rational basis for two related reasons. First, by awarding Mulligan his lost gross profits, rather than lost net profits, the panel majority put Mulligan in a better position than he would have been in if Abbott had performed the

---

[17] Particularly with regard to the irrationality argument, both parties cite to federal cases interpreting the Utah Arbitration Act in conjunction with the FAA. Although the Federal and Utah Arbitration Acts are similar in many respects, *see Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1140 (10th Cir. 2008), the states are not bound to adopt the Supreme Court's interpretation of the FAA as controlling their own statutes. Moreover, these cases are even less helpful in light of *Hall Street*. 552 U.S. at 590 ("The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable. But here we speak only to the scope of the expeditious judicial review under §§ 9, 10, and 11, deciding nothing about other possible avenues for judicial enforcement of arbitration awards.").

Agreement. Second, the panel majority's award of gross profits to Mulligan does not draw its essence from the Agreement, which clearly contemplated that Mulligan would be required to incur costs and do substantial work.

(Appellant's Opening Br. at 41.)

We recognized an irrationality basis for vacatur in *Jenkins*, and there concluded the distinction between "irrationality" and "manifest disregard" seems to lie in whether the arbitrators disregarded the terms of the contract as opposed to the rule of law. 847 F.2d at 634. "[T]he role of the courts in reviewing arbitral awards is limited to the determination of whether the arbitrator's award draws its essence from the contract of the parties." *Id*. at 634-35 (quotations omitted). If an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *E. Assoc. Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62 (2000) (quotations omitted). The rational basis test is "to ensure that the arbitrator's decision relies on his interpretation of the contract as contrasted with his own beliefs of fairness and justice."[18] *Jenkins*, 847 F.2d at 634; *see also Stolt-Nielsen*, 130 S. Ct. at 1767 ("[A]n arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded [his] powers,' for the task of an arbitrator is to interpret and enforce a contract, not to make public policy.").

Abbott again fails to recognize our limited role on review. His first argument is

---

[18] Strict adherence to this standard is necessary to remain within the statutory grounds for vacating an arbitration award under *Hall Street*. "Irrationality" is confined to an arbitration panel's complete departure from the terms of the agreement subject to arbitration. Only then will the arbitrators have exceeded their authority under § 10.

merely a complaint that Mulligan was awarded more than Abbott thinks fair. He cites no

provision of the Agreement precluding the arbitration panel's award. As discussed

above, Mulligan's damages arguments were based on the contract. As we pointed out

earlier, the only contract provision allocating costs were those relating to Abbott's share

of the fees (1/3 if he paid the initial expenses, otherwise 1/4). The arbitration panel

awarded Mulligan only 2/3 of the fees, the amount he would have received if Abbott paid

all of the initial expenses in all of the cases. Whether we agree with the award is

irrelevant. There was a contractual basis on which the arbitration panel based its

conclusion. Its decision is, as a practical matter, immune from judicial oversight.

C.      Waiver of Public Policy Argument

Abbott did not make his public policy argument to the district court prior to its

ruling. The court heard the argument for the first time in Abbott's Rule 59(e) motion to

reconsider. He claimed an exclusive referral Agreement violates the professional ethical

rules and must be declared void. The court concluded Abbott waived the argument by

failing to raise it prior to his motion to reconsider. In the alternative, it determined the

argument lacked merit. Despite his failure to raise the argument earlier (which he

concedes), Abbott argues the courts have a duty to address public policy arguments *sua*

*sponte* and such arguments cannot be waived or forfeited[19] because they involve the

---

[19] Recently, in *Richison v. Ernest Group, Inc.*, we discussed the difference
between waiver and forfeiture in civil cases. 634 F.3d 1123 (10th Cir. 2011). "If the
theory was intentionally relinquished or abandoned in the district court, we usually deem
it waived and refuse to consider it." *Id*. at 1127. "By contrast, if the theory simply
wasn't raised before the district court, we usually hold it forfeited." *Id*. at 1128. "Unlike
waived theories, we will entertain forfeited theories on appeal, but we will reverse a

interests of the public, not merely those of the parties.

The cases Abbott cites in support of his argument involve courts' refusal to enforce illegal contracts. *See, e.g., Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 77 (1982) ("There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law."); *Warner Bros. Theatres, Inc. v. Cooper Found.*, 189 F.2d 825, 828-29 (10th Cir. 1951) ("The agreement . . . created a monopolistic condition . . . and was illegal and void on its face."). Those cases certainly suggest that contending parties are not reliable guardians of the public interest. *Seymour v. Blue Cross/Blue Shield*, 988 F.2d 1020, 1023 (10th Cir. 1993) ("The public policy exception is rooted in the common law doctrine of a court's power to refuse to enforce a contract that violates public policy or law. It derives legitimacy from the public's interest in having its views represented in matters to which it is not a party but which could harm the public interest."). But that does not resolve the waiver problem.[20]

---

district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result." *Id.* The public policy issue was presented to the arbitration panel but was not presented to the district court prior to its ruling. The issue was waived.

[20] *Hall Street*, insofar as it calls into question *any* judicially created grounds for vacating an arbitrator's award, necessarily calls the public policy basis for doing so into question. *See Hicks v. Cadle Co.*, 355 Fed. Appx. 186, 196-97 (10th Cir. 2009) (unpublished), *cert. denied*, 131 S. Ct. 160 (2010).

Were we to consider the public policy issue, we would be mindful that when an arbitrator could "reasonably construe[] the facts of the case to eliminate . . . a conflict with established law, then the public policy exception does not apply." *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1151 (10th Cir. 2007). The arbitration panel determined the Agreement established a joint representation, not merely an exclusive referral

There is no Supreme Court or Tenth Circuit precedent insulating a public policy argument from waiver. To the contrary, in *Wilburn v. Mid-South Health Development, Inc.*, we determined the plaintiffs waived their public policy argument because they failed to assert it in the district court. 343 F.3d 1274, 1280-81 (10th Cir. 2003); *see also United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747, 752 n.4 (6th Cir. 2003) ("Although not the basis of our decision, there appears to be merit to the argument that the Postal Service waived its public policy challenge to the arbitration award by failing to raise it during arbitration."); *Reliance Nat'l Health Ins. Co. v. Imber*, 182 F.3d 922, No. 98-3565, 98-3568, 1999 WL 510752, at *1 n.2 (7th Cir. 1999) (unpublished) ("Defendants also argue in their reply brief that the provision is void because it violates public policy, but they have waived this argument by failing to raise it in their opening brief.").

"We typically find waiver in cases where a party . . . attempts to reassert an argument that it previously raised and abandoned below." *United States v. Zubia-Torres*, 550 F.3d 1202, 1205 (10th Cir. 2008). Abbott argued his public policy concerns to the arbitration panel, but he did not mention the issue to the district court until after it had ruled. The issue was waived.

---

agreement, and the parties' agreement could have been terminated by either of them at any time. Moreover, Abbott could have turned away clients he felt the associated duo could not properly represent.

It is telling that Abbott's concern for the most effective service for his clients did not manifest itself in an open and timely conversation with Mulligan. Instead, it came out as a *post hoc* justification for his self-dealing. We can conclude the arbitration panel's reasonable construction of the contract avoided the alleged ethical problem.

AFFIRMED.

Entered by the Court:

**Terrence L. O'Brien**
United States Circuit Judge